# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JASON RAY WEAVER,

    Plaintiff,

vs.

PACCAR INC.,

    Defendant.

CV 213-007

## ORDER

Plaintiff Jason Weaver, a diesel mechanic, was left disabled after a commercial truck he was inspecting ran over his leg. He has filed a complaint in this Court against the truck's manufacturer, Defendant PACCAR Inc., under a products liability theory, alleging that Defendant's failure to install a "neutral safety switch" on the truck was the proximate cause of the accident. Dkt. no. 1. Before the Court is Defendant's Motion for Summary Judgment, Dkt. no. 19, along with Plaintiff's Motion to Exclude Defendant's Reply Brief in Support of its Motion for Summary Judgment, Dkt. no. 40.[1] Plaintiff's motion to strike is **DENIED**. Because the Court finds that Defendant's design of the

---

[1] Plaintiff's motion to exclude is effectively a motion to strike, and the Court will refer to it as such.

1

truck did not proximately cause Plaintiff's injuries, Defendant's motion for summary judgment is **GRANTED**.

## FACTUAL BACKGROUND

Weaver, a diesel mechanic at Wall Timber Company in Jesup, Georgia, was permanently injured when a 2004 manual transmission Kenworth T800 truck-tractor rolled over his leg. Truck driver Chris Manning brought the truck to Wall Timber's mechanic shop with an apparent air leak. Dkt. No. 19-3, p. 5. Weaver gave his account of the accident at his deposition:

> I was going underneath a truck to find an air leak. . . . I found the air leak at the left front rear drive brake chamber. [Manning] had brakes released. The truck was not running, nobody in the seat. He had brakes released on the truck. . . . [Shop foreman Lynn Burnem] got on a creeper and got under the truck with me. . . . [Burnem] said, well, he's going to have to fire it up to build the air back up so I can make sure that's where it is. Apparently the driver heard Lynn telling me that he's going to have to fire it back up and he walked and [cranked] the truck without me or [Burnem]. . . knowing and forgot that he had left the brakes released and the truck in gear. He [cranked] the truck from the ground, never climbed in the truck, and the truck took off. And when it took off, it [ran] over me. It ran over my left leg and run up on my right leg, and my right leg stopped it like a wheel chock and it was sitting on my left leg. . . . Because they couldn't find any jacks in the shop . . . they backed over me, blowing my knee out the back of my leg.

Weaver Dep. 21:19-23:10.

Manning testified that although he initially set the parking break, Weaver instructed him to release the brake, put the truck into gear, and turn the truck off because it's "the

only way to tell what the problem is." Manning Dep. 8:10-14. Manning, standing on the side of the truck, reached up and pressed the start button after he "heard everybody say 'Fire it back up; we lost air pressure.'" Id. at 8:11-23. Manning said this response was a "natural reaction" and that he was "not thinking," even though he remembered the truck was in gear when he pressed the start button, which resulted in the truck moving forward. Id. at 8:21-25. Plaintiff claims he "would never have advised the driver to crank the truck while it was in gear." Weaver Aff. ¶ 11.

The accident destroyed most of the muscle, tissue, and lymphatic system in Plaintiff's leg, requiring three operations. Id. at 24:7-11, 25:13. As a result of the accident, Plaintiff's leg will require daily medical attention, or else an infection in the leg could ultimately lead to his death. Id. at 48:6-11. Plaintiff also suffers from extreme nerve pain. Id. at 33:20-23.

Plaintiff claims that he would not have suffered his injuries if Defendant had installed a "neutral safety switch" on the Kenworth T800 that ran over his leg. Dkt. no. 1, ¶ 14. A neutral safety switch is a feature that prevents the truck from starting when the transmission is not in neutral. Morrill Dep. 40:20-24. Similar to a neutral safety switch, a "clutch safety switch" requires the clutch to be depressed before the truck can be cranked. Id. at 40:9-16. According to Plaintiff's expert,

Jeffery Morrill, "no matter the design or the device, the function of the systems is to prevent unintended movement of the vehicle when starting the engine to protect the safety of the operator, persons nearby and property." Morrill Aff. ¶ 10.

Richard Sedgley, who was employed for 31 years by Kenworth Truck Company, a division of PACCAR, and who worked in a variety of positions such as structural analysis engineer and manager of safety and compliance, testified that the neutral safety switch was "offered [] as an option" to the "highly sophisticated" customer base. However, "98 percent of the people that we sell trucks to aren't interested in it." Sedgley Dep. pg. 14:10-25. He also explained that the switch was not classified by PACCAR as a safety option. Id. at 17:18-20. Sedgley testified that PACCAR relies on drivers of the trucks it manufactures to "operate the vehicle in how they've been trained." Id. at 21:11-13. "[T]hese individuals are trained to put [the truck] in neutral, start the truck. And when they leave the truck, they apply the parking brakes, they leave it in neutral. It's all part of their training." Id. at 21:2-6.

Schyler Peck, a retired PACCAR employee, offered several reasons why a truck driver may prefer a truck without a neutral safety switch. Peck suggests that not having a neutral safety switch enables the driver to move the truck by small increments while the engine is running. Peck Dep. 17:5-25. This

maneuverability can be useful when the driver needs to nudge the truck in small increments to align the trailer with loading or unloading areas, such as a dump truck bed. Id. If a neutral safety switch were on the truck, the driver would have to use the clutch to make these movements, which could move the truck further than intended. Without the switch, the driver my use the starter. Id. Furthermore, Peck testified that the switch adds a potential failure mechanism, and that many drivers do not think that any added benefit of a neutral safety switch outweighs the possibility that the switch will fail and leave the driver stranded, unable to start the truck. Id. at 14:4-12.

**LEGAL STANDARD**

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

## DISCUSSION

### I.  Motion to Strike

Plaintiff has filed a Motion to Exclude Defendant's Reply Brief in Support of its Motion for Summary Judgment. See Dkt. no. 40. Plaintiff argues that Defendant filed the reply brief, Dkt. no. 37, outside of the requisite time limits of Southern District of Georgia Local Rule 7.6.

The Court declines this invitation to tally the days between the parties' filings according to the various provisions of our Local Rules and the Federal Rules of Civil Procedure, and instead reiterates this District's pronouncement that "failure to satisfy the notice and timing provisions of Local Rule 7.6 cannot be used by an opposing party as a sword to have a brief

stricken." Brown v Chertoff, No. 4:06-CV-002, 2008 WL 5190638, at *1 (S.D. Ga. Dec. 10, 2008). Plaintiff's motion to strike is **DENIED**.

II. **Strict Products Liability**

Plaintiff alleges that Defendant is strictly liable under a products liability theory for designing the Kenworth T800 without a neutral safety switch.

In Georgia,

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

Georgia Code Ann. § 51-1-11(b)(1) (2009). Thus, to establish a claim of products liability in Georgia, the plaintiff must show that (1) he was injured by a product manufactured by the defendant, (2) the product was not "merchantable and reasonably suited to the use intended" when the manufacturer sold it, and (3) this unmerchantable and unreasonable condition of the product was the proximate cause of the plaintiff's injuries.

Defendant does not contest that Plaintiff suffered injuries because of the Kenworth T800 truck it manufactured. It does argue, though, that the truck was not defective and that, even

AO 72A
(Rev. 8/82)

if it was, any defect was not the proximate cause of Plaintiff's injuries. If the Plaintiff fails to establish a material question of fact as to either of these two issues, summary judgment is appropriate.

**a. Proximate Cause**

Under Georgia law, "[n]o matter how negligent a party may be, if their act stands in no causal relation to the injury it is not actionable." Jonas v. Isuzu Motors Ltd., 210 F. Supp. 2d 1373, 1377 (M.D. Ga. 2002) aff'd, 58 F. Appx. 837 (11th Cir. 2003) (quoting Finney v. Machiz, 463 S.E.2d 60, 61 ( Ga. Ct. App. 1995)). "Strict liability is imposed for injuries which are the proximate result of product defects, not for the manufacture of defective products. Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery. Id. (quoting Talley v. City Tank Corp., 279 S.E.2d 264, 269 (Ga. Ct. App. 1981)).

At the summary judgment stage, the question of proximate cause in a products liability case presents a formidable hurdle to defendants. In Georgia, "it is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by courts in plain and undisputed cases." Sanders v. Lull Intern., Inc., 411 F.3d 1266, 1271 (11th Cir. 2005) (quoting Ontario Sewing Mach. v. Smith, 572 S.E.2d 533, 536 (Ga. 2002)).

Nevertheless,

> [i]t is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by the defendant, was not triggered by the defendant's acts, and which was sufficient of itself to cause the injury.

Walker v. Giles, 624 S.E.2d 191, 200 (Ga. Ct. App. 2005). In Georgia, "foreseeability means that which is objectively reasonable to expect, not merely what might occur." Jonas, 210 F. Supp. 2d at 1377. Furthermore, "the unforeseeable negligence of another person is an intervening cause that negates the liability of a manufacturer for an allegedly defective product." Id. at 1379. Thus, "[i]f the original negligent actor reasonably could have anticipated or foreseen the intervening act and its consequences, then the intervening act of negligence will not relieve the original actor from liability for the consequences resulting from the intervening act." Lindsey v. Navistar Intern. Transp. Corp., 150 F.3d 1307, 1317 (11th Cir. 1998) (quoting Eubanks v. Busn. Equip. Ctr. of Atlanta, Inc., 288 S.E.2d 273, 274 (Ga. Ct. App. 1982)).

In this case, the Court may only determine the issue of proximate cause if the issue is "plain and undisputed." See Sanders, 411 F.3d at 1271. While Plaintiff does not explicitly argue that the issue of proximate cause is disputed, it could be

AO 72A
(Rev. 8/82)

argued that it is in this case because Plaintiff argues that the proximate cause of his injuries was Defendant's failure to install a neutral safety switch on the Kenworth T800, while Defendant argues that the proximate cause was the negligence of multiple people—particularly Manning, the driver—in the shop where the accident occurred. However, the Court wishes to make clear that this is not the type of dispute the court in Sanders contemplated when it relegated "disputed" questions of proximate cause to the jury.

In Sanders, a construction worker sued a forklift manufacturer after one of the manufacturer's forklifts toppled over, injuring the construction worker. Id. at 1268. The construction worker presented the affidavit of an expert who posited three possible explanations as to why the forklift tipped over. Id. at 1269. One of these explanations was that a third party had bypassed the safety mechanism that would have prevented the forklift from tipping; the other two explanations involved mechanical errors within the forklift itself. Id. While the expert testified that the third-party intervention was the more likely explanation, the court in Sanders held that the issue of proximate cause would ultimately be one for the jury, because there was no physical or eyewitness evidence supporting the "third party" theory and a reasonable juror could have

determined that the cause of the accident was a mechanical problem with the forklift itself. Id. at 1271.

Here, the Court is not faced with three plausible and discrete causes of Plaintiff's injuries. Both parties agree to the relevant facts of the accident: Defendant manufactured a truck without a neutral safety switch, which driver Manning brought to Plaintiff for service and absent-mindedly cranked, knowing it was in gear and would thus lurch forward, while Plaintiff lie beneath it. The dispute between the parties is not the factual dispute as to what caused Defendant's product to injure Plaintiff, as was the case in Sanders. Rather, the dispute is the legal conclusion that flows from the agreed-upon facts. Therefore, the issue of proximate cause in this case is appropriately a question for the Court to decide.

Proceeding to the legal question of proximate cause, the Court first notes that the record shows there was indisputably an intervening act between Defendant's allegedly negligent decision to manufacture a truck without a neutral safety switch and Plaintiff's injuries. Primarily, Manning—either on his own volition or at the request of the mechanics—cranked the truck, knowing that the truck was in gear and could lurch forward.[2]

---

[2] In addition to Manning's negligent acts, Defendant argues that Plaintiff and his shop foreman, Lynn Burnem, were also negligent in failing to follow industrywide safety protocols before crawling under the truck. Because Plaintiff calls into question whether these protocols were in fact followed at Wall Timber as a matter of practice, the Court focuses on Manning's acts

Whether directed to do so or not, no one contests that Manning's actions were negligent. Even by his own admission, he cranked the truck while he "wasn't thinking." Thus, Manning's actions were a sufficiently intervening negligent act for purposes of this proximate cause analysis.

Furthermore, Manning's negligence was not foreseeable to Defendant at the time it manufactured the truck. Plaintiff argues that Manning's acts were foreseeable to Defendant, and likens the facts in this case to those in <u>Jones v. Amazing Products, Inc.</u> to support his argument. 231 F. Supp. 2d 1228 (N.D. Ga. 2002). In <u>Amazing Products</u>, the plaintiff transferred liquid drain cleaner from the handleless bottle it was packaged in to an emptied, handled Clorox bottle. <u>Id.</u> at 1233. The transfer catalyzed a chemical reaction which caused the drain cleaner—composed of 97% sulfuric acid—to eat through the bottom of the Clorox bottle and gush onto the plaintiff's leg, giving him severe chemical burns. <u>Id.</u> at 1234. The court, in holding that it should have been reasonably foreseeable to the defendant who manufactured and packaged the chemical that a user would transfer the product from its handleless container to one with a handle, noted that the defendant had testified that it assumed most of its product's users would be untrained in the use of

---

in its analysis, as his actions are undisputed and alone sufficient to break the causal chain between Defendant's design of the Kenworth T800 and Plaintiff's injuries.

chemicals. Id. at 1241-42. The court, in denying summary judgment, concluded that the defendant could not assume that the average, untrained consumer would realize the dangers of transferring the chemicals, and therefore had negligently designed the bottle in such a way as to encourage a transfer. Id. at 1242.

Defendant counters that the facts in this case are more similar to those in Moore v. ECI Management, 542 S.E.2d 115 (Ga. Ct. App. 2000), and Jonas v. Isuzu Motors, Ltd., 210 F. Supp. 2d 1273 (M.D. Ga. 2002), where courts granted the defendant-manufacturers' summary judgment motions in part based on lack of proximate cause. In Moore, a trained washer/dryer installer died from electrocution after he indisputably miswired the power-cord to a unit he was installing. Moore, 542 S.E.2d at 118. The plaintiffs argued that the defendant-manufacturer had negligently designed the washer/dryer unit by failing to pre-attach the power cord to the unit, thus adding an unnecessarily risky step to the installation process. Id. at 119. The Georgia Court of Appeals affirmed the trial court's grant of summary judgment, in part because "the direct cause of the accident . . . was the miswiring of the power cord" by the deceased installer, who was an experienced, trained professional

AO 72A
(Rev. 8/82)

and "should have been well aware of the danger of electrocution." Id. at 120.³

The court in Jonas, applying Georgia law, granted summary judgment to the defendant who manufactured a vehicle that rolled several times during a car accident, killing three of the four passengers. 210 F. Supp. 2d at 1375-76. In granting summary judgment, the court held that even if an alleged design defect left the vehicle prone to roll, "driver error and negligence" were the proximate cause of the accident. Id. at 1378. Evidence in the record, particularly the driver's dying declaration that he had fallen asleep at the wheel, established that the driver's negligence caused the accident. Id. Because the Court found that the driver's negligence was not foreseeable to the manufacturer, the court granted the manufacturer's motion for summary judgment. Id. at 1380.

Here, Manning's negligence was the proximate cause of Plaintiff's injuries, and that negligence was not foreseeable to Defendant. Unlike the circumstances in Amazing Products, where the court held that the manufacturer could not assume the

---

³ The court in Moore affirmed summary judgment in favor of two separate defendants: the owner of the apartment complex where the washer/dryer unit was installed and the manufacturer of the washer/dryer unit. Plaintiff sued the apartment owner on a premises liability theory, and the manufacturer on a products liability theory. While the court explicitly affirmed summary judgment for lack of proximate cause on the premises liability theory, the court incorporated this reasoning by reference when it affirmed summary judgment for the manufacturer as well. Moore, 542 S.E.2d at 120 (noting, after concluding that there was no design defect under the risk/utility analysis, that the court must, "again . . . point out that the direct cause of the accident in this case was the miswiring of the power cord.").

average consumer would have any experience or training in how to safely handle chemicals, Defendant expected that the operator of a T800 would have been trained in operating large trucks. Particularly, it would be entirely reasonable for Defendant to assume that whoever would operate the T800 would have a valid Commercial Driver's License and would operate the vehicle in accordance with the attendant rules and procedures of that license. See, e.g., Sedgley Dep. 20:8-19, 21:7-13. A large truck may be an inherently dangerous vehicle, just as the drain cleaner in Amazing Products was an inherently dangerous product. But laws and regulations require that only those persons trained on how to manage those dangers actually operate a truck such as the T800. Just as it was not reasonably foreseeable to the defendant in Moore that a trained professional would miswire its washer/dryer unit, it was not reasonably foreseeable to Defendant that the end-user of its product would neglect to follow the industry's standard protocol when he cranked the truck while it was in gear and the parking brake was disengaged.

Furthermore, Manning's negligence in this case was of a greater degree than that of the chemical-burned plaintiff in Amazing Products, and Defendant here was unable to foresee that negligence. Unlike the plaintiff in Amazing Products, who was negligent only insofar as he did not appreciate the dangers of transferring unknown chemicals to another container, Manning

15

knew and appreciated the risk of cranking the T800 while it was in gear with the parking brake disengaged. Manning's negligence was not born out of ignorance, but absent-mindedness. He admits that he simply "wasn't thinking" when he cranked the truck. Manning's actions, then, are more similar to those of the deceased driver in <u>Jonas</u>, who appreciated the risks of driving while drowsy, but could only rue his failure to stay awake after he had already caused an accident by falling asleep at the wheel. Defendant-manufacturers may be expected to foresee negligence born of ignorance, but they are not expected to foresee negligence from distraction, inattentiveness, or absent-mindedness. They are not charged with building commercial trucks for those who do not think, any more than cars are to be made for sleeping drivers. Defendant in this case could not foresee Manning's negligence, which proximately caused Plaintiff's injuries. Therefore, summary judgment in this case is **GRANTED**.

### b. Design Defect

Georgia courts interpret the phrase "not merchantable and reasonably suited for the use intended" to mean "defective." <u>Hunt v. Harley-Davidson Motor Co., Inc.</u>, 248 S.E.2d 15, 15 (Ga. Ct. App. 1978). Product defects can come in the form of manufacturing defects, design defects, and marketing/packaging defects. <u>Banks v. ICI Americas, Inc.</u>, 450 S.E.2d 671, 672 (Ga. 1994). To determine whether a device is defective, <u>Banks</u>

introduced a risk/utility analysis "whereby the risks inherent in a product design are weighed against the utility or benefit derived from the product." Id. at 673. The Georgia Supreme Court then identified several factors that courts may consider in weighing the risk of a product's design against its utility. Id. at 675 n.6.[4]

Because courts are not in a position to weigh the various Banks factors against one another, judgment as a matter of law "will rarely be granted in design defect cases when any of these elements is disputed." Ogletree v. Navistar Intern. Transp. Corp., 522 S.E.2d 467, 470 (Ga. 1999). "Indeed, the adoption of the risk-utility analysis in this state has actually increased the burden of a defendant, in seeking judgment as a matter of law, to show plainly and indisputably an absence of *any* evidence that a product design is defective." Id.

Plaintiff, through the affidavit of his expert Jeffery T. Morrill, has presented evidence that, he argues, tilts the balance of the risk/utility analysis in his favor. Defendant

---

[4] "These factors include: the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; . . . the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance[;] the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative." Banks v. ICI Americas, Inc., 450 S.E.2d 671, 675 n.6 (Ga. 1994).

challenges not only Morrill's evidentiary conclusions, but the admissibility of those conclusions as well. Because the Court ultimately finds that Defendant's design—whether it was defective or not—did not proximately cause Plaintiff's injuries, the Court need not sift through the parties' competing arguments regarding the safety and utility of designing a truck without a neutral safety switch.

**CONCLUSION**

Because Defendant could not reasonably foresee the negligence of a third party that proximately caused Plaintiff's injuries, Defendant's motion for summary judgment is **GRANTED**. For reasons stated in Part I above, Plaintiff's motion to strike Defendant's reply brief is **DENIED**. The Clerk of Court is directed to enter the appropriate judgment.

**SO ORDERED**, this 30TH day of September, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA